55 P.(2d) 667

## PACIFIC NAT. AGRICULTURAL CREDIT CORPORATION v. HAGERMAN.

### No. 4021.

Supreme Court of New Mexico.

Feb. 3, 1936.

See, also, 39 N.M. 549, 51 P.(2d) 857.

J. O. Seth, of Santa Fé, for appellant.
Hurd & Crile, of Roswell, for appellee.

SADLER, Chief Justice.

For some years prior to November 1, 1931, Southspring Ranch & Cattle Company, a corporation, hereinafter called "the Ranching Company," had been indebted in substantial amount to Pacific National Agricultural Credit Corporation, the appellee herein. The indebtedness was secured by chattel mortgage on several thousand head of sheep and certain ranch equipment. Maturities from time to time were cared for by successive renewals. The creation of the indebtedness extended as far back as 1927. The capital stock of the Ranching Company was owned by the Hagerman family. Herbert J. Hagerman was its president, Percy Hagerman its vice president and active manager, and Lowry Hagerman, his son, secretary-treasurer. The separate stock ownership of Herbert and Percy Hagerman aggregated almost eighty percent of the capital stock of the company.

Lowry Hagerman, the appellant herein, at all material times owned what is known as the Arcade Ranch. The Ranching Company, at some time in the year 1927, occupied said ranch with its large herds of sheep and continued at all material times in such occupancy, using same for the grazing of its sheep. Said herds were under mortgage to appellee when first brought upon the ranch of appellant. The latter knew of the existence of this mortgage, which was renewed from time to time, as aforesaid. The last renewal, prior to November 1, 1931, took place in February, 1931.

On November 1, 1931, the principal balance due upon said mortgage as last renewed was the sum of $50,000. A renewal was arranged as of that date which involved an additional advancement of $12,-000, bringing the indebtedness to the new

principal amount of $62,000. In connection with such renewal, the indorsement of the paper by Herbert Hagerman and Percy Hagerman was required and secured. The renewal was pursuant to a loan agreement dated November 21, 1931, which set out the conditions of such renewal. It seems that appellee, the mortgagee, proposed to pledge the new note and mortgage to Federal Intermediate Credit Bank of Berkeley, Cal. In connection with negotiations for the pledge, Federal Intermediate Credit Bank demanded of appellee that it secure from the Ranching Company, on certain named conditions, a pasturage agreement or lease from Lowry Hagerman to the Ranching Company on the Arcade Ranch to run for the life of the loan. One of the conditions was that the lessor should consent to assignment of the lease to appellee by the Ranching Company as "additional collateral." Another condition, subsequently interposed and consented to by all parties concerned, was that appellee be permitted to assign the lease to Federal Intermediate Credit Bank.

The negotiations in connection with the requirement for the lease and its subsequent assignment were almost wholly by telegraphic communications between appellee and the Ranching Company. In substance, and so far as material, the terms of the pasturage arrangement, arrived at by an exchange of telegraphic communications as aforesaid and carried forward into the formal written instrument dated November 1, 1931, provided: (1) That, of a balance amounting to $6,172.68 due for pasturage fees accrued prior to November 1, 1931, $2,500 should be paid by lessee, the Ranching Company, within four months and the balance on or before August 1, 1932. (2) Current rentals, at the rate of five cents per head per month, were to be paid by lessee on or before the 10th day of each month for the preceding month.

Pursuant to an express consent to assignment, carried in the lease agreement, a formal assignment to appellee, dated December 2, 1931, was executed by the Ranching Company, reading as follows:

"Roswell, New Mexico, Dec. 2, 1931.

"For value received, The Southspring Ranch and Cattle Company hereby assigns to Pacific National Agricultural Credit Corporation its rights under the foregoing agreement upon the following express conditions:

"First This assignment is made upon the express understanding that it is to be held by Pacific National Agricultural Corporation as additional Collateral to a note of the Southspring Ranch and Cattle Company to Pacific National Agricultural Credit Corporation dated Nov. 1, 1931, in the amount of sixty-two thousand dollars ($62,000.00) and due one year after date, said note having been given under the terms of an agreement between The Southspring Ranch and Cattle Company and Pacific National Agricultural Credit Corporation dated Nov. 21, 1931.

"Second Pacific National Agricultural Credit Corporation shall not use the pastur-

age rights hereby assigned for any purpose other than for the carrying of sheep acquired from The Southspring Ranch and Cattle Company.

"The Southspring Ranch and Cattle
  Company,

"By Percy Hagerman, Vice-Pres.

"[Seal]
"Attest:
"Lowry Hagerman, Secretary.

  "San Francisco, ———— 1931.

"The above assignment is accepted subject to all its terms and conditions.

"Pacific National Agricultural Credit
  Corporation,

  "By ————————, President."

As indicated in the copy of said assignment just quoted, there was indorsed at the end thereof a form of written acceptance for execution by the appellee. The lease, with attached assignment, was duly transmitted to appellee. It retained the assignment without objection for approximately two months, when, on January 29, 1932, by letter to the Ranching Company, it acknowledged receipt of the lease and assignment, stating that the written acceptance "was not executed as it was not thought necessary by us that we should execute the acceptance."

In disbursing the proceeds of the aforementioned advancement of $12,000, the appellee honored a draft drawn on it by appellant for $841.50, which sum appellant applied on account of arrearages earned prior to November 1, 1931. When it paid said draft, the appellee was without knowledge that any part of its proceeds was to be used to pay or apply on said arrearages. Except for this credit, the total amount of such arrearages, and in addition current rentals for the months of April, May, and June, 1932, in the sum of $1,331.75, remained due the appellant under the lease agreement at the time of trial.

The appellant, Lowry Hagerman, had personal knowledge of the terms and conditions of the contract dated November 21, 1931, hereinabove referred to, under which the additional advance of $12,000 was made. One of such conditions was that evidence should be furnished by the Ranching Company to appellee "of continuing first lien upon collateral now under pledge" to it. The appellant also had personal knowledge of the assignment of said grazing lease by the Ranching Company to appellee as "additional collateral." The chattel mortgage dated February 24, 1931, foreclosed by the decree here reviewed, was properly acknowledged so as to entitle the same to record and was duly filed with the chattel mortgage records in Chaves and Torrance counties New Mexico, in the month of March, 1931.

The appellee never entered into possession of any of the lands of the appellant known as the Arcade Ranch, but at all material times it was known to it that the sheep in question were being grazed on appellant's lands and that the Ranching Company was indebted to him for such grazing as aforesaid.

Default having occurred in the payment of the indebtedness evidenced by the renewal of November 1, 1931, foreclosure proceedings were instituted by appellee against the Ranching Company, Percy and Herbert Hagerman as the indorsers of its paper being joined with prayer for personal judgment against them for the amount of any deficiency resultant upon foreclosure. Lowry Hagerman intervened in the suit, setting up an agister's lien as security not alone for balance due on current rentals, but also for the amount unpaid on arrearages accrued to November 1, 1931. He asserted priority for his agister's lien over the lien of appellee's mortgage, claiming, by reason of what had transpired, that appellee had given its express consent in writing to priority of his agister's lien over the lien of its chattel mortgage within the meaning of section 82-405, Comp.1929, and that appellee was estopped to assert the contrary.

The trial court made findings of fact substantially as hereinabove recited, and based conclusions of law thereon. It held, in effect, that no express consent in writing had been given by appellee as required by the agisters' lien statute; that appellee was not estopped to claim priority for the lien of its mortgage; that no privity of contract existed between appellant and appellee by virtue of the Ranching Company's assignment of said lease agreement to appellee; subordinated appellant's lien to the lien of appellee's chattel mortgage; and entered decree of foreclosure accordingly. From such judgment this appeal is prosecuted by Lowry Hagerman, the intervener below, appellant here.

The appeal is before us on an abbreviated record with three questions reserved for review in præcipe filed below. Stated briefly, they are: (a) Did not the trial court err in failing to conclude, as requested, that the telegrams and correspondence in evidence relative to the leasing agreement amount to a consent in writing that appellant's claim of lien should take precedence over the lien of appellee's chattel mortgage? (b) Did not the trial court err in refusing to conclude, as requested, that appellee's failure to object to the form provided for its written acceptance of the assignment of lease agreement and holding same for approximately two months without notifying appellant of its failure to execute said acceptance, estopped appellee from claiming priority for its mortgage over the agister's lien of appellant? (c) Did not the trial court err, in view of the facts found, in failing to conclude, as requested, that the appellant was entitled to a lien for the amounts unpaid under said lease agreement, superior to the chattel mortgage lien of appellee?

The three questions resolve themselves into one: Do the writings produced, including form for acceptance of the lease agreement treated as signed by appellee, constitute an express consent in writing by it that appellant's agister's lien shall take precedence over the lien of appellee's chattel mortgage? We are forced to the conclusion that they do not.

The pertinent statute, section 82-405, Comp.1929, with the language controlling our view italicized, reads as follows: "Inn-keepers, livery stable keepers, lessors, and agistors, and those who board others for pay, or furnish feed, shelter or pasture for the property and stock of others, shall have a lien on the property and stock of such guest or guests and lessees, or of those to whom feed or shelter has been furnished until the same is paid, and shall have the right to take and retain possession of such property and stock until the indebtedness is paid. It shall be unlawful for a lessee or owner to remove live stock from the leased premises without the consent of the lessor or agistor unless the amount due for pas-turage be paid. *The liens provided in this section shall not take precedence over prior filed or recorded chattel mortgages, duly filed or recorded as now provided by law, unless the holder of such mortgage shall expressly so consent in writing;* Provided, that the giving of such written consent shall not affect the rights or priority under a prior mortgage as against a subsequent mortgage, but the rights, liens and priori-ties of all such mortgages shall be and re-main the same as if no such written con-sent had been given."

This section of the lien laws was enacted in its original form as Laws 1884, c. 17, § 1, (section 3339, Code 1915), amended by Laws 1917, c. 65, § 20 and reduced to pres-ent language by a further amendment, Laws 1923, c. 24, § 20 (section 82-405, Comp.1929). It was not until the amend-ment of 1923 that the right to an agister's lien was created. El Paso Cattle Loan Co. v. Hunt, 30 N.M. 157, 228 P. 888. But the very language creating the lien limits its operation as against prior filed or recorded chattel mortgages to cases where the holder of the latter has expressly consented in writing to subordinate the lien of his mort-gage to that of the agister.

What is express consent? It so ob-viously carries its own meaning that it is even difficult to define. It is positive, di-rect, unequivocal consent. Perhaps it can best be defined by stating its antithesis. "Express consent" is that consent which does not require the aid of inference or im-plication to supply its meaning. Then how can that consent to subordinate a lien truly be called express which, in the writing or writings said to evidence it, fails even to refer to the liens which form its subject matter?

If A., the holder of a chattel mort-gage on certain livestock about to be pas-tured by B., in a writing directed to B., says: "I consent that your agister's lien for any unpaid pasturage fees shall take pre-cedence over the lien of my mortgage," or, "I agree not to assert the lien of my mort-gage ahead of your agister's lien," or, "I agree to subordinate the lien of my mort-gage to your agister's lien to the extent of any unpaid pasturage bill," we have the case of express consent in writing as con-templated by the statute. We do not pre-tend to say that this particular language or any set formula of words is essential to priority of the lien. But we do mean to

say that express words of consent relating themselves in the writing to the subject-matter of such consent, viz., the order of payment of claims, is absolutely essential if the act is to be given any effect whatever.

Appellant calls to our attention that in some jurisdictions, absent such a provision as that found in our statute, the courts give the agister's lien priority, if the pasturage is furnished with the consent of the mortgagee, express or implied, citing Kaufman v. Hewitt, 118 Wash. 556, 204 P. 199; Smeed v. Stockmen's Loan Co., 48 Idaho, 643, 284 P. 559; Case v. Allen, 21 Kan. 217, 30 Am.Rep. 425. It was no doubt to forestall such possible construction of our own statute that the requirement of express consent to the priority, in writing, was written into it.

The pasturage or lease agreement here involved was assigned to appellee as "additional collateral" to its chattel mortgage. The terms of the lease agreement which it agreed to accept as such collateral were arrived at by an interchange of telegrams and letters, and carried forward into the lease agreement between appellant and the Ranching Company. It is difficult to believe that appellee ever actually intended to subordinate the lien of its mortgage not alone to current pasturage fees, but as well to an overdue account therefor in excess of six thousand dollars. One of the written conditions under which the additional advancement of $12,000 was agreed to be made was that the Ranching Company should furnish evidence to appellee of a "continuing first lien upon collateral now under pledge," a thing impossible if the subordination claimed took place. The telegrams from appellee to the Ranching Company, at least two of them, call for evidence of seniority of the mortgage lien against livestock collateral.

Neither in the writings preceding the lease agreement nor in it do we find an express consent to the priority claimed. We cannot supply such consent by implication without closing our eyes to the plain mandate of the statute. Nor do we consider the appellee estopped to rely upon the priority obtaining under its chattel mortgage.

It follows from what has been said that the judgment appealed from must be affirmed.

It is so ordered.

HUDSPETH, BICKLEY, and ZINN, JJ., concur.

BRICE, J., did not participate.